2002 ME 133

**CITY OF OLD TOWN**

v.

**Antonios DIMOULAS et al.**

Supreme Judicial Court of Maine.

Argued: April 4, 2002.
Decided: Aug. 9, 2002.

Mark V. Franco, (orally), Thompson & Bowie, Portland, for the plaintiff.

Antonios Dimoulas, Claudia Dimoulas, Stillwater, Charles E. Gilbert, (orally), Gilbert & Greif, Bangor, for the defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Antonios and Claudia Dimoulas appeal from several judgments entered in the Superior Court (Penobscot County). The Dimoulases appeal from a summary judgment (*Marden, J.*) entered in favor of the City of Old Town in the Dimoulases' counterclaim to recover damages for defamation; a judgment (*Marsano, J.*) entered following a jury trial declaring that a zoning ordinance adopted by referendum is inconsistent with the City's Comprehensive Plan and constitutes illegal spot zoning; and a judgment as a matter of law (*Marsano, J.*) in favor of the City in the Dimoulases' counterclaim brought pursuant to 42 U.S.C. § 1983 alleging that the City violated their civil rights by failing to act in a timely manner in their attempt to renew their victualer's license. The City cross-appeals from that part of the judgment following the jury verdict (*Marsano,*

*J.*) that the City is collaterally estopped from denying a license to the Dimoulases because of the Planning Board's prior approval of a site plan. We vacate the judgment declaring the ordinance invalid, but affirm the judgments on the section 1983 and defamation claims. We do not reach the collateral estoppel question.

[¶ 2] The City's Comprehensive Plan was adopted by the City Council in April of 1995. Regarding the Stillwater area, where the parcel of land at the center of this dispute is located, the Plan provides, in pertinent part:

Commercial activity in what is now downtown Old Town began around 1832 to serve the workers, sawmill operators, and river drivers who congregated in this area. Downtown is still an important local commercial center, although Stillwater Avenue had superseded downtown as the principal commercial area.... The Stillwater area grew up around the ledges in Stillwater. Although Stillwater village is not a commercial center, it remains a desirable residential community.

Old Town, Me., Comprehensive Plan 9–1 (April, 1995).

[¶ 3] Later, in a section entitled "Commercial and Industrial Trends," the Plan describes the development of commercial activity in the Stillwater area in more detail:

While the downtown area still contains the largest concentration of businesses, other commercial areas have emerged in recent decades. There is now a great deal of commercial activity along Stillwater Avenue. Commercial growth in recent years has been guided by the City's zoning ordinance, which places the downtown in the C–1 (Commercial Business) zone, portions of Stillwater Avenue in the C–3 (Highway Commercial) and C–4 (Shopping Center) zones,

and a small portion of Treat–Webster Island in the C–3 Zone. There are a number of home occupations located throughout the community, as well as neighborhood grocery stores.

*Id.* at 9–4.

[¶ 4] The City Charter allows ordinances to be adopted by referendum. It provides that "[a]n ordinance adopted by a vote of the people shall not be repealed or amended except by a vote of the people, unless such ordinance shall otherwise expressly provide."

[¶ 5] Section 111.4 of the City Zoning Ordinances defines the Commercial–Business C–1 zone as follows:

> The C–1 zone is established to accommodate those retail, service and office uses which are of city-wide significance. Within this area of concentrated activity and intensive development is the central business district, offices of professional and nonprofessional persons offering a variety of specialized services, and important public facilities. New construction and any alteration of existing building or land use should be consistent with the objective to develop and maintain the central business district.

Old Town, Me., Zoning Ordinance § 111.4 (January 23, 1984).

[¶ 6] Subsection (b) of that same section lists permitted uses for land zoned C–1. Almost any normal business activity is permitted in the C–1 zone.

[¶ 7] The Dimoulases had been operating a small store on Stillwater Avenue for several years. In addition to groceries and other sundries, the store had a delicatessen and bakery. Although the store property was zoned as residential, the store did not violate the zoning ordinance because the ordinance allowed neighborhood grocery stores in residential areas. In 1995, the Dimoulases decided to set up

tables and chairs where customers could eat deli and bakery items. The Code Enforcement Officer determined that these proposed changes would not be consistent with the definition of neighborhood grocery store. The Dimoulases appealed this determination to the Zoning Board of Appeals (the Board), where they argued that the tables and chairs did not bring the store outside the definition of neighborhood grocery store because a neighborhood grocery store was defined as a business *primarily* for the purpose of selling food for consumption off-premises. The Dimoulases reasoned that providing a location for on-premises consumption of food was a secondary purpose because the area with the tables and chairs took up only about ten percent of the floor space of the store. The Board agreed, and reversed the determination of the Code Enforcement Officer.

[¶ 8] In regard to the issuance of licenses, the ordinances provide, in pertinent part:

> When any applicant or premises is found, based upon the appropriate inspections by the city or the department of human services (division of health engineering), not in compliance with the requirements of the department of human services or city regulation, the city may refuse issuance of the license.

Old Town, Me., Zoning Ordinance § 10–22(a) (January 16, 1984).

[¶ 9] The Dimoulases obtained a victualer's license on November 12, 1997. This license was revoked after the Code Enforcement Officer inspected the premises and determined that the Dimoulases were using more than ten percent of the floor space for the on-premises consumption of products purchased at the store and were

consequently not in compliance with the zoning ordinances.[1]

[¶ 10] In appealing this determination, the Dimoulases asked the Planning Board to rezone their property from Residential R–1 to Commercial C–1.[2] The Board took evidence and considered this proposed change at a hearing on May 22, 1998. At the end of the hearing, the Board found that rezoning the property to C–1 would be inconsistent with the Comprehensive Plan and would constitute illegal spot zoning. It consequently refused to rezone the property.

[¶ 11] In response to this denial, the Dimoulases arranged to have a referendum presented to the voters in the next election that would change the classification of the lot on which the store was located from R–1 to Commercial C–1. In a special election on June 9, 1998, the question presented to the voters was whether to:

> Amend the Official Zoning Map of the City of Old Town, Maine by changing 827 Stillwater Avenue, Map 15, Lot 7 on the City of Old Town tax maps, from R–1 to Commercial C–1.

[¶ 12] The Planning Board had held a public hearing on the proposed amendment on May 22, 1998. The Board unanimously recommended that the voters not adopt the proposed ordinance, but the voters approved the amendment. Immediately after the election, the Dimoulases appealed the City Clerk's May 27, 1998 denial of a victualer's license on the ground that the City Clerk's determination was rendered "moot" by the referendum. The City Council did not hold a hearing or issue a ruling on this appeal.

[¶ 13] On June 24, 1998, the City, its Code Enforcement Officer, and two neighbors of the Dimoulases filed a complaint in the Superior Court against the Dimoulases seeking a declaratory judgment that the amendment adopted by referendum was void because it failed to comply with the Comprehensive Plan and constituted illegal spot zoning, and that the restaurant was located on a parcel of land zoned R1–S.[3] The Dimoulases counterclaimed seeking damages for (1) violations of their civil rights, pursuant to 42 U.S.C. § 1983, arising out of the refusal of the City to issue the victualer's license, and (2) defamation arising from derogatory comments made by the City Manager about the Dimoulases.

[¶ 14] On June 29, 1998, the Dimoulases applied for a site plan review pursuant to the City's Zoning Ordinances. The site plan review was required in order for the Dimoulases to obtain a victualer's license. The site plan was approved on September 14, 1998, and the Dimoulases received a victualer's license in October.

[¶ 15] Meanwhile, the Superior Court entered a summary judgment in favor of the City in the Dimoulases' defamation

---

1. Apparently, the Code Enforcement Officer made this determination in September of 1997, which was before the license issued. The license was subsequently revoked due to this determination sometime after it was issued.

2. The Dimoulases also took several other actions in response to the revocation of the license. First, they applied for a variance, but were refused. They also brought an action in the Superior Court and procured a stay of the revocation of the license. The City and the Dimoulases subsequently disagreed about whether the stay required the City to renew the license once it expired. Ultimately, the City refused to renew the license when it expired in May of 1998.

3. This refers to the fact that the area where the property is located is a "shore overlay zone." It is possible to have commercial zones within the shore overlay zone.

counterclaim, on the ground that the City is immune under the Maine Tort Claims Act. The court denied summary judgment on the other claims. A jury trial was held on the remaining issues.[4] The jury found that (1) the amendment to the ordinance adopted by referendum was invalid because it was inconsistent with the Comprehensive Plan, (2) the amendment constituted illegal spot zoning, (3) the property is located in an R1–S district and consequently is not zoned for use as a restaurant, (4) the Dimoulases were nevertheless entitled to continue operating the Market Café as a restaurant because the approval of the site plan was res judicata and the City was estopped from claiming that the Dimoulases could not operate a restaurant, and (5) the City had violated the Dimoulases civil rights, and the Dimoulases were damaged in the amount of $2500. The parties renewed motions for judgments as a matter of law on the claims.

[¶ 16] The Superior Court upheld the jury's determinations on the question involving the Comprehensive Plan and spot zoning, as well as the determination that the Dimoulases could continue to operate their enterprise as a restaurant. The court vacated the jury's verdict in favor of the Dimoulases on their section 1983 claim, and entered judgment for the City, concluding that the Dimoulases did not have a property interest in a victualer's license as a matter of law, and that the evidence on damages was insufficient. The Dimoulases appealed the judgments against them, and the City cross-appealed that part of the judgment that the Dimoulases were entitled to continue to operate the restaurant.

I.

[¶ 17] Any municipal zoning ordinance must "be pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body." 30–A M.R.S.A. § 4352(2) (1996). A "comprehensive plan" is "a document or interrelated documents containing the elements established under section 4326, subsections 1 to 4 ['local growth management program'], including the strategies for an implementation program which are consistent with the goals and guidelines established under subchapter II ['GROWTH MANAGEMENT PROGRAM].'" *Id.* § 4301(3).

[¶ 18] Although the question of whether the ordinance is consistent with the Comprehensive Plan is a question of law, the burden is on the City, as the party challenging the ordinance, to "prov[e] that the challenged amendment[ ][is] inconsistent with the ... comprehensive plan." *Vella v. Town of Camden,* 677 A.2d 1051, 1053 (Me.1996). In enacting the ordinance, the voters of Old Town determined that the proposed ordinance was in harmony with the Comprehensive Plan. We discern no error in that determination.

[¶ 19] Although the City identifies several sections of the Comprehensive Plan that it contends the ordinance violates, these provisions do not prohibit commercial development in the Stillwater area. The City argues that the absence of a statement affirmatively allowing commercial development in the Stillwater area should be interpreted to mean that no commercial development is permitted. We disagree. The absence of language expressly allowing commercial development in the Stillwater area does not necessarily mean that no development is allowed, and some commercial development in that area is not inconsistent with the Comprehensive Plan.

4. Because they involve questions of law, it is not clear why the issues involving the Comprehensive Plan and spot zoning were determined by a jury.

[¶ 20] The City also contends that the ordinance adopted by the voters was illegal "spot zoning." The term "spot zoning" refers to any zoning ordinance that is designed to specifically benefit a particular parcel of land. *Vella,* 677 A.2d at 1053. "Spot zoning" is not itself a pejorative term, and the mere fact that an ordinance benefits a particular piece of land will not render it illegal. *Id.* Illegal spot zoning is the "process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners." *Id.* at 1053–54 (quoting *Rodgers v. Village of Tarrytown,* 302 N.Y. 115, 96 N.E.2d 731, 734 (1951)). In order to constitute illegal spot zoning, the ordinance "(1) must pertain to a single parcel or a limited area—ordinarily for the benefit of a particular property owner or specially interested party—and (2) must be inconsistent with the city's comprehensive plan, or if there is none, with the character and zoning of the surrounding area, or the purposes of zoning regulation, *i.e.,* the public health, safety, and general welfare." *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 39–40 (D.C.1979) (followed by *Vella,* 677 A.2d at 1053).

[¶ 21] Because the City has failed to establish that this ordinance is inconsistent with the Comprehensive Plan, the ordinance does not constitute illegal spot zoning.[5] Accordingly, we vacate the judgment entered on the jury verdict that the ordinance is inconsistent with the Comprehensive Plan and is illegal spot zoning, and do not address the City's challenge to the jury's determination that it was estopped from prohibiting the Dimoulases from operating the restaurant.[6]

## II.

[¶ 22] The Dimoulases also challenge the Superior Court's decision to set aside the jury verdict finding that their civil rights had been violated and awarding them $2500 in damages. The jury's findings of fact are entitled to deference, and we review the record to determine whether there was sufficient evidence to support the jury's verdict. *Marquis v. Farm Family Mut. Ins. Co.,* 628 A.2d 644, 648 (Me.1993).

[¶ 23] In order to establish a claim under 42 U.S.C. § 1983, the plaintiff must establish "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Chongris v.*

---

**5.** The requirement that a zoning ordinance be consistent with a comprehensive plan is a statutory requirement. 30–A M.R.S.A. § 4352(2) (1996). The doctrine of illegal spot zoning, as articulated in *Vella,* is a common law rule developed to ensure that municipal zoning bodies do not act in a manner that is arbitrary, irrational, or unfair. *See generally* DELOGU, MAINE LAND USE CONTROL LAW §§ 6.01–.07 (1997). Since consistency with a comprehensive plan is sufficient to satisfy the common law requirement that neither the ordinance itself nor the procedures employed to enact it were arbitrary or fundamentally unfair, the spot zoning doctrine, as a practical matter, is reserved for municipalities that have not enacted a valid comprehensive plan. Now that the Legislature has required all municipalities to adopt a comprehensive plan to govern their zoning rules, it is likely that the common law spot zoning principles—while still valid—will be less significant.

**6.** We are unpersuaded by the City's argument that the referendum failed to fully change the zoning ordinance because the area was also within an R1–S overlay zone. The overlay zone refers to the fact that this land is close to a shore, and land in this overlay zone can be either residential or commercial.

*Board of Appeals of the Town of Andover,* 811 F.2d 36, 40 (1st Cir.1987). If the plaintiff is able to establish the deprivation of an interest protected by the due process clause of the Fourteenth Amendment, we must decide what process is "due" and whether it was provided. *Id.*

[¶ 24] Even if we assume that the Dimoulases' right to a victualer's license constituted a property interest sufficient to trigger the protections of the due process clause, and that the damage evidence presented by the Dimoulases was sufficient, we are unpersuaded that the Dimoulases were denied adequate process. Applicants to an administrative entity are entitled, at a minimum, to notice and the opportunity to be heard before an adverse determination is made against them. *See Gorham v. Town of Cape Elizabeth,* 625 A.2d 898, 902 (Me.1993) (applicant to an administrative board is entitled to a fair and unbiased hearing). In this case, the City Council did not address the Dimoulases' appeal from the denial of their request for a victualer's license. The City did bring a declaratory judgment action, however, to determine the validity of the recently enacted amendment to the ordinance that rezoned the land to allow the Dimoulases to operate the restaurant. For purposes of a due process analysis, the legal issues surrounding the amendment to the ordinance, and the right of the Dimoulases to operate the restaurant were resolved in court proceedings. The court proceedings gave the Dimoulases notice and an opportunity to be heard on the issue of their right to operate their restaurant, and there was no denial of due process.

## IV.

[¶ 25] The Dimoulases also challenge the summary judgment granted to the City in their defamation counterclaim based on comments made by the City Manager at a meeting of the City Council. The Dimoulases concede that the City would normally be immune from liability under the Maine Tort Claims Act, 14 M.R.S.A. § 8101–8118 (1980 & Supp.2001), for the comments of the City Manager in this context, but argue that liability has been waived pursuant to 14 M.R.S.A. § 8116 (Supp.2001), which provides that a governmental entity waives its immunity to the extent it obtains insurance that provides coverage in areas where the entity would normally enjoy immunity. Here the City has a policy issued by the Maine Municipal Association Property & Casualty Pool. The policy, however, limited coverage to "those areas for which governmental immunity has been expressly waived" pursuant to specified provisions, and also provided that "[l]iability coverage shall not be deemed a waiver of any immunities or limitation of damages available under the Maine Tort Claims Act, or other Maine statutory law, judicial precedent or common law." In *Doucette v. City of Lewiston,* 1997 ME 157, ¶¶ 8–10, 697 A.2d 1292, 1294, we concluded that this disclaimer is sufficient to avoid a waiver of immunity pursuant to section 8116. Accordingly, summary judgment was properly entered in favor of the City on the Dimoulases' defamation claim.

The entry is:

Judgment affirmed in part, and vacated in part and remanded to the Superior Court.